**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **DE'JOURE MERCER** | **Case No. 1:21-cv-1713** |
| **Plaintiff,** | |
| **v.** | **Judge _____** |
| **NFL ENTERPRISES LLC, a Delaware limited liability company,** | |
| **Defendant.** | |

**COMPLAINT**

**Demand for Jury Trial:  Pursuant to S.D. Ind. L.R. 38-1 and Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues so triable.**

    **COMES NOW** Plaintiff, De'Joure Mercer ("Mercer" or "Plaintiff"), by and through undersigned counsel, and for his Complaint against Defendant NFL Enterprises LLC (sometimes referred to herein as "NFLE" or "Defendant") states as follows:

**NATURE OF THE ACTION**

    1.    This is a libel action arising out of four (4) online publications created and published by the NFLE.[1] The NFLE's Publications accuse Mercer, a police officer employed by the Indianapolis Metropolitan Police Department (the "Metro Police" or "IMPD"), of committing "police misconduct" in connection with the death of Dreasjon "Sean" Reed ("Reed"), which occurred on May 6, 2020 (the "May 6 Encounter").

    2.    The truth of the matter is that Mercer committed no misconduct during the May 6 Encounter and was publicly cleared of all alleged wrongdoing. Despite a highly-publicized investigation and other information that clearly exculpated Mercer of all wrongdoing, all of which

---

[1] These publications are sometimes collectively referred to herein as the "Publications" or the "NFLE's Publications."

was publicly available and was in fact possessed by and known to one of the National Football League's[2] teams, the Indianapolis Colts, the NFLE published several online statements accusing Mercer of police misconduct. As detailed below, the NFLE published its false statements of fact negligently and with a reckless disregard of the truth; the NFLE's statements are defamatory per se and have caused Mercer to suffer severe emotional and reputational injury in his personal and professional capacities.

## PARTIES, JURISDICTION, AND VENUE

3. The foregoing allegations are hereby incorporated by reference as if fully restated and realleged herein.[3]

### A.   DE'JOURE MERCER

4. Mercer was born and raised in greater Indianapolis. Mercer began working as a police officer for the IMPD in 2015 and has worked there for approximately six (6) years. At all times relevant to this Complaint, Mercer was and has been a police officer for the IMPD serving the Indianapolis community.

5. In 2019 and 2020, Mercer won several awards for his outstanding police work.  In 2019, Mercer was recognized as the Northwest District's "Officer of the Year" at the IMPD Employee Recognition Banquet, a notable achievement. In 2020, just days before the May 6 Encounter, Mercer was awarded the Northwest District's prestigious "Officer of the Year" by the Indianapolis Fire Department, IMPD, and the Marion County Sheriff's Office, as part of their joint annual community recognition awards. A photograph taken at the 2020 awards ceremony, reprinted here for convenience, illustrates that Mercer (third from the left, holding the framed

---

[2] The National Football League is sometimes abbreviated herein as the "NFL."
[3] Pursuant to this paragraph, throughout this Complaint, each new heading and subheading is hereby deemed to incorporate by reference all of the previously-alleged paragraphs as if fully restated therein.

award) is and was, at all times, a highly-respected police officer by his peers and the high-ranking

officers of the IMPD:



6.      Mercer, throughout his career as a police officer, never committed any police

misconduct or violated any protocol. At all times relevant to this Complaint, Mercer possessed an

exceptional reputation in the Indianapolis community and was regarded as an upstanding citizen

and police officer.

7.      Mercer values privacy and, prior to the May 6 Encounter and the NFLE's

Publications, had no notoriety in the community of any kind.

**B.      NFL ENTERPRISES LLC**

8.      The National Football League is one of the world's largest professional sports

leagues measured by viewership and revenue.

9.      The National Football League created NFL Enterprises LLC to oversee, operate,

and control the National Football League's digital media accounts and endeavors.

10.     NFL Enterprises LLC is a limited liability company formed under the laws of the State of Delaware.  NFL Enterprises LLC may be served by delivering a copy of the summons and Complaint to its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

11.     NFL Enterprises LLC is the entity that operates the National Football League's official website (www.NFL.com) (sometimes referred to herein as the "Website"). *See* NFL.com Terms and Conditions, https://www.nfl.com/legal/terms (last visited May 6, 2021).

12.     NFL Enterprises LLC operates the National Football League's official Twitter page and Facebook page. The NFL's official Twitter page can be accessed at https://twitter.com/NFL (last visited May 10, 2021) (sometimes referred to herein as the "Twitter Page").[4] The NFL's official Facebook page can be accessed at https://www.facebook.com/NFL (last visited May 10, 2021) (sometimes referred to herein as the "Facebook Page").

13.     The sole member of NFL Enterprises LLC is NFL Ventures L.P., a Delaware limited partnership. The sole general partner of NFL Ventures L.P. is NFL Ventures, Inc., a Delaware corporation.

14.     NFL Ventures, Inc., a corporation, as set forth in 28 U.S.C. § 1332(c), is a citizen of both Delaware and New York, having been organized under the laws of the State of Delaware and having its principal place of business located at 345 Park Avenue, New York, New York 10154. Therefore, NFL Enterprises LLC is a citizen of both Delaware and New York.

15.     Within the last decade, the National Football League, largely in the wake of the National Anthem controversy sparked by Colin Kaepernick in the summer and fall of 2016 (the

---

[4] URLs, when used herein, shall be deemed to incorporate by reference the contents of the webpage accessible through the URL.

"National Anthem Controversy"), has actively and purposefully extended its sphere of influence beyond professional football by affirmatively backing and announcing its support for certain socio-political agendas and viewpoints.

16.     Accordingly, the National Football League, by and through NFLE, has created and sponsored social justice campaigns. One such campaign, the NFLE's "Inspire Change" campaign, is a focal point of this lawsuit.[5]

17.     Social responsibility campaigns (such as the "Inspire Change" campaign at issue in this lawsuit) boost a company's brand image and positively influence profits and the value of the company's trademarks.[6] Corporate social responsibility campaigns build brand equity by building brand awareness, enhancing brand image, establishing brand credibility, evoking brand feelings, creating a sense of brand community, and eliciting brand engagement.[7] In this way, the NFLE's "Inspire Change" campaign and the publications at issue in this lawsuit were published, in part, for the purpose of enhancing the NFL's tangible and intangible monetary value.

## C.     DREASJON "SEAN" REED

18.     Although not a party to this lawsuit, Reed and his character traits are at issue. Reed's character for violence, which was known in the community at the time of the NFLE's

---

[5] The Inspire Change campaign was launched in January of 2019. *See* NFL.com, *Overview– Inspire Change*, https://www.nfl.com/causes/inspire-change/overview (last visited May 10, 2021). The publications at issue in this lawsuit, however, were published over one year later. The NFL describes its "Inspire Change" campaign as a "NFL Social Justice Initiative." *Id.* (via Google Search Results). The NFL ran an "Inspire Change" advertisement during the Super Bowl. *See* NFL.com, *Inspire Change, Super Bowl LV Commercial*, https://www.nfl.com/causes/inspire-change/ (last visited May 10, 2021).

[6] Timothy Creel, *How Corporate Social Responsibility Influences Brand Equity*, Management Accounting Quarterly, Summer 2012, Vol. 13, No. 4, *available at* https://www.imanet.org/-/media/5ab6966eedf6461ab37ff8b8f2fb6eba.ash (last visited March 9, 2021).

[7] *Id.*

Publications, is probative of the NFLE's negligence and reckless disregard of the truth as detailed later in this Complaint.

19.     At the time of the May 6 Encounter, Reed was 21 years old.

20.     Prior to the May 6 Encounter, Reed stole a handgun from a pawn shop in Texas. Reed published pictures of himself posing with the stolen handgun on social media.

21.     Prior to the May 6 Encounter and the NFLE's Publications, Reed livestreamed himself committing a "drive-by" shooting, firing the stolen handgun blindly into buildings as he drove past.  The Indiana State Police confirmed this fact.[8] A copy of this shocking Facebook Live video, which was uploaded by Reed to his personal Facebook page in February of 2020, can be viewed at: https://www.youtube.com/watch?v=sRFmmwuoMD8 (last visited May 12, 2021).

22.     Reed also livestreamed the May 6 Encounter on Facebook. The stolen handgun is visible in the livestream. The Indiana State Police, during its investigation of the May 6 Encounter as alleged below, reviewed Reed's livestream video in detail. A copy of the livestream can be viewed at: https://www.youtube.com/watch?v=Omdad_yiKE8&t=2s (last visited May 12, 2021).

23.     In the livestream video of the May 6 Encounter, at approximately 9:15, while he is being followed by Metro Police, Reed is heard saying: "I'm gonna start shooting."

24.     At the time of his death, Reed had three outstanding warrants, including one for felony intimidation and two arising from his theft of the handgun that he used to shoot at Mercer during the May 6 Encounter.[9]

---

[8] Vic Ryckaert, *ISP Says Dreasjon Reed Was Involved in Previous Drive-Bys, But Provides Few Details*, IndyStar.com (Nov. 20, 2020), https://www.indystar.com/story/news/crime/2020/11/20/dreasjon-reed-involved-drive-bys-isp-says-but-few-details/6246662002/.

[9] Crystal Hill, *Family Statements, Previous Police Interactions Suggest Dreasjon Reed's Story is Complex*, IndyStar.com (May 13, 2020), https://www.youtube.com/watch?v=Omdad_yiKE8&t=2s.

25.     If the NFLE had conducted a simple Google search on Reed, the NFLE would have learned the above information.

**D.     JURISDICTION AND VENUE**

26.     Mercer is a citizen of the State of Indiana. Mercer resides and is domiciled in the State of Indiana.

27.     NFL Enterprises LLC is a citizen of the State of Delaware and the State of New York.  NFL Enterprises LLC is wholly owned by NFL Ventures, Inc., a Delaware corporation.

28.     There exists complete diversity of citizenship between Mercer and NFL Enterprises LLC.

29.     The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees.

30.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

31.     This Court has personal jurisdiction over NFL Enterprises LLC pursuant to Indiana's Long Arm Statute, Ind. R. Trial P. 4.4(A) and the United States Constitution because:

a.   NFL Enterprises LLC does business in this District by and through the National Football League and one of its member teams, the Indianapolis Colts;

b.   NFL Enterprises LLC derives substantial revenue from its contacts within this District, including deriving revenue from the Indianapolis Colts.  Colts, Inc. d/b/a Indianapolis Colts has its principal place of business at 7001 West 56th Street, Indianapolis, Indiana 46254;

c.   NFL Enterprises LLC caused tortious injury to be suffered by Mercer in this District;

d.  NFL Enterprises LLC conducts and operates digital media promoting the Indianapolis Colts, an NFL franchise within this District;

e.  NFL Enterprises LLC, upon information and belief, designed the website template that is used by the Indianapolis Colts in Indiana; and

f.  NFL Enterprises LLC's Publications targeted the State of Indiana by falsely accusing an IMPD officer of misconduct.

32.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the NFLE is subject to personal jurisdiction in this District and/or a substantial part of the events giving rise to this claim occurred in this District, including but not limited to publication and injury.

## **DETAILED FACTUAL BACKGROUND**

33.  The foregoing allegations are hereby incorporated by reference as if fully realleged herein.

34.  For a succinct timeline of the facts of this case, see the attached *Exhibit A*, which is hereby incorporated by reference.

## E.    THE MAY 6 ENCOUNTER

35.  On May 6, 2020, Mercer risked his life to protect his community when he engaged in a pursuit of Reed, who was seen driving recklessly at dangerous speeds in northwest Indianapolis on the same day. The critical facts of the May 6 Encounter, as detailed by the later-produced Indiana State Police ("ISP") investigation (the "ISP Investigation"), are as follows:

36.  Around 6:00 PM on May 6, 2020, Metro Police Deputy Chief Kendale Adams ("Adams") saw a gray Toyota Corolla operated by Reed driving recklessly on I-65 near 30th Street in Indianapolis. Adams stated that Reed almost struck other vehicles while he was exiting the interstate.

37.     Adams attempted to stop Reed, but Reed refused to pull over. A high-speed car chase followed.

38.     Several other Metro Police officers, including Mercer, joined the pursuit, but by 6:10 PM, a Metro Police sergeant ordered that the high-speed chase be terminated because of the speed at which Reed was driving.

39.     Pursuant to Metro Police protocol, the termination of a chase simply means that officers turn off their lights and sirens and cease attempting to get the suspect vehicle to stop (in hopes that the suspect will slow down). Even if a chase is a terminated, Metro Police protocol allows an officer to continue monitoring the suspect.

40.     In accordance with this protocol, Mercer continued monitoring Reed. Minutes later, Mercer watched Reed drive eastbound on 62nd Street and park at a local business. Reed left his car, and Mercer began chasing Reed on foot.

41.     Mercer caught up to Reed at the intersection of West 62nd Street and Michigan Road. Reed, while running, began sticking his hands in his waistband. After shouting several verbal warnings and demands at Reed, Mercer fired his taser at Reed, and Reed fell to the ground.

42.     As he was falling to the ground, Reed pulled his handgun from his waistband and fired two rounds at Mercer. In self-defense, and in protection of his own life and that of the public, Mercer returned fire. Mercer fired several rounds at Reed, killing him.

43.     Mercer's use of force was fully justified under Indiana law, including Ind. Code §§35-41-3-2(c) and 35-41-3-3(b).

44.     Pursuant to Metro Police protocol, Mercer immediately called for paramedics for Reed after Reed was shot.

45.     At no point during the May 6 Encounter did Mercer violate protocol, commit any police misconduct, intentionally murder Reed or commit any other crimes.

**F.     A DETAILED INVESTIGATION AND UNEQUIVOCAL EXCULPATION**

46.     The May 6 Encounter sparked multiple protests in Reed's honor, despite the fact that Mercer was justified in his use of force and committed no misconduct. Some of these protests even caused the Mayor of Indianapolis to issue and extend curfew orders.[10]

47.     In the wake of those protests and because of well-publicized episodes of police misconduct across the United States, certain members of the public seized the opportunity to accuse Mercer of racist police misconduct by intentionally murdering Reed, despite the fact that Mercer did nothing wrong and was protecting himself and his community.

48.     As a result of the consequent public outcry, on or about June 4, 2020, the state appointed a special prosecutor, Rosemary Khoury, a Black woman, to impartially investigate the case and pursue any available charges against Mercer. Ms. Khoury asked the ISP to independently investigate the May 6 Encounter.

49.     The ISP spent hundreds of hours reviewing available video, ballistics reports, and other evidence in connection with the May 6 Encounter.

50.     On or about November 10, 2020, a grand jury found that there was insufficient evidence to indict Mercer for homicide or any other crime arising out of the death of Reed.

51.     On or about November 10, 2020, the ISP held a press conference explaining in detail the findings of its investigation and stating that Mercer's use of force against Reed was justified under Indiana law. A video of this press conference was available and remains available

---

[10] Dwight Adams, *Indianapolis Extends Curfew Over Tuesday Night*, IndyStar.com (June 2, 2021), https://www.indystar.com/story/news/local/marion-county/2020/06/02/indianapolis-curfew-extended-overnight-tuesday/3123847001/.

online and can be viewed at the following Facebook link: https://www.facebook.com/watch/?v=361829335144794 (last visited May 11, 2021).

52.     During the press conference, Ms. Khoury stated that the grand jury did not find sufficient "evidence to indict or accuse" Mercer of wrongdoing. She continued: "I hope that anyone who was a part of this entire process can look at this and feel comfortable that the investigation was done in an impartial manner. Because that is what my team and I did over the past five months." She also stated that she is the "mother of two black boys" and expressed empathy for Mercer, stating that the May 6 Encounter "had to be a difficult position to be in."  This information was publicly available.  A video of Ms. Khoury's statement is still available online and can be viewed at the following Facebook link:  https://www.facebook.com /watch/live/?v=1782183345266051&ref=watch_permalink (last visited May 11, 2021).

53.     Ms. Khoury's statement, the results of the ISP investigation, and the grand jury's refusal to indict were highly-publicized and were republished by many news organizations who were covering the story surrounding the May 6 Encounter.[11] All of these publications were publicly available in print, on television programs, and on the internet. The NFLE, however, never republished or acknowledged the information exculpating Mercer and continued to assert—and even republish and affirm—its accusation that Mercer committed actions amounting to "police misconduct."

---

[11] *E.g.*, Rick Callahan, *No Charges Against Indianapolis Officer in Fatal Shooting*, Associated Press (Nov. 10, 2020), https://apnews.com/article/us-news-shootings-police-indianapolis-indiana-58239f9ce3d11bb152a36802d81eb48e; Elizabeth DePompei, *Grand Jury: No Charges for IMPD Officer Who Fatally Shot Dreasjon Reed*, IndyStar.com (Nov. 10, 2020), https://www.indystar.com/story/news/crime/2020/11/10/indianapolis-police-shooting-dreasjon-reed-grand-jury-verdict/5885006002/; Vanessa Romo, *Indianapolis Grand Jury Declines to Indict Officer Who Killed Dreasjon Reed*, NPR (Nov. 10, 2020), https://www.npr.org/2020/11/10/933684216/indianapolis-grand-jury-declines-to-indict-officer-who-killed-dreasjon-reed.

54.     Pursuant to IMPD protocol for any officer-involved shooting, after the ISP Investigation had been completed, the IMPD's Firearms Review Board (the "Board") conducted an investigation and found the discharge of Mercer's weapon during the May 6 Encounter to be in compliance with Metro Police General Order 1.3 pertaining to Use of Force.  IMPD Chief Randal Taylor ("Chief Taylor") wrote a letter to Mercer confirming the Board's findings. A true and correct copy of that letter is attached hereto as **Exhibit B**.  In other words, the IMPD itself found that Mercer committed no misconduct.

## G.      THE NFL'S FALSE AND DEFAMATORY PUBLICATIONS

55.     The NFLE published via the Website, Twitter Page, and Facebook Page no less than four (4) publications accusing Mercer of committing occupational misconduct.

### The Say Their Stories Video[12]

56.     On or about September 11, 2020, the NFLE published the "Say Their Stories" Video on the Website.[13]  The Video is still available online and can be accessed at: https://www.nfl.com/videos/say-their-stories-narrated-by-keith-david (last visited May 12, 2021). The Video is hereby incorporated by reference into this Complaint.

57.     The Video was created as part of the NFLE's "Inspire Change" campaign.

58.     Upon information and belief, the Video was distributed by the NFLE on at least one television broadcast.

59.     The Video is narrated by actor Keith David and is nearly three (3) minutes long. The Video incorporates David's narration over a series of videos and photos of individuals who

---

[12] The Say Their Stories Video is sometimes referred to herein as the "Video."

[13] The Internet Archive (a.k.a. the Wayback Machine) reflects that the web page hosting the Say Their Stories video went live on or about September 11, 2020. *See* https://web.archive.org/web/20200601000000*/https://www.nfl.com/videos/say-their-stories-narrated-by-keith-david (last visited May 12, 2021).

were allegedly victims of social injustice. The Video heavily references and focuses on George Floyd.[14]

60.    At approximately the one-minute mark (1:00) in the Video, the NFLE states: "Throughout the 2020 season, the NFL will honor victims of social injustice by wearing those victims' names on their hats and on their helmets. And most importantly, telling their stories."

61.    At approximately 1 minute and 37 seconds into the Video, the NFLE states that the Inspire Change: Say Their Stories campaign is "a mission to go beyond [the victims'] names, to dig deeper, to reveal who they really were, and why they are no longer with us."  At the conclusion of that sentence, the NFLE published a picture of Reed.

62.    The Video gives rise to the inference, implication, and imputation that Mercer committed occupational misconduct and even criminal acts during the May 6 Encounter with Reed, similar to that which were inflicted upon George Floyd. This inference, implication, and imputation is false because Mercer committed no such acts. Similarly, the Video accuses Mercer of committing acts amounting to "social injustice," which is unequivocally and demonstrably false.

**The Website Publication**

63.    On or about September 19, 2020, the NFLE published its Website Publication.[15] The Website Publication is still available online and can be accessed at:

---

[14] The story of George Floyd is well-known. Just weeks after the May 6 Encounter, George Floyd was killed in police custody after a Minneapolis police officer kneeled for more than nine minutes on Floyd's neck. That police officer, Derek Chauvin, was subsequently tried and convicted for Floyd's murder. *See* Eric Levenson, *Derek Chauvin Found Guilty of All Three Charges for Killing George Floyd*, (April 21, 2021), https://www.cnn.com/2021/04/20/us/derek-chauvin-trial-george-floyd-deliberations/index.html.

[15] The Internet Archive (a.k.a. the Wayback Machine) reflects that the relevant web page on the Website went live on or about September 19, 2020. *See* https://web.archive.org/web/20200701000000*/https://www.nfl.com/photos/inspire-change-say-their-stories (last visited May 10, 2021).

https://www.nfl.com/photos/inspire-change-say-their-stories (last visited May 10, 2021).  A true and correct copy of the Website Publication is attached hereto as **Exhibit C**.

64.     The Website Publication was created as part of the NFLE's "Inspire Change" campaign.  The Website Publication was titled, "Inspire Change: Say Their Stories."

65.     At the top of the Website Publication, in the first sentence of text, the NFLE published the following false and defamatory statement:

> "NFL players are wearing helmet decals to honor victims of systemic racism, victims of police misconduct, and social justice heroes. Read on to learn more."

66.     The Website Publication continues, on the same page, by publishing, alphabetically, the photographs and names of eighty-seven (87) individuals. The list includes names such as Emmett Till and George Floyd. As well, at number 33, the list includes the name of Reed as depicted in the below screenshot:



67.     In the text immediately below the image of Reed, the NFLE provides Reed's date of death was May 6, 2020 and republishes a statement from Reed's mother. When the same text is clicked, the NFLE takes the reader to another page, incorporated by reference into the Website

Publication, which lists the names of the NFL players who purportedly wore or are wearing helmet decals in support of the 87 individuals.[16] Under Reed's name, the NFLE indicates that only one player, Matthew Adams (Indianapolis Colts), chose to wear a decal honoring Reed. At least one news source indicated, however, that Matthew Adams actually did not wear a decal honoring Reed.[17]

68.     The Website Publication is false because Mercer did not commit "police misconduct" or any action amounting to "police misconduct," as previously alleged.

**The Twitter Publication (the "Tweet")**

69.     On or about December 16, 2020, the NFLE published a Tweet on the Twitter Page. The Tweet is still available online and can be accessed at: https://twitter.com/nfl/status/1339246439063416833?lang=en (last visited May 10, 2021). A true and correct copy of the Tweet (with comments redacted) is attached hereto as ***Exhibit D***.  A screenshot of the Tweet is reprinted below for convenience:

---

[16]   This web page is still available online and can be accessed at: https://www.nfl.com/news/say-their-stories-players-and-coaches-list (last visited May 10, 2021).

[17]   *See* WTHR.com Staff, *Colts Player Will Not Honor Dreasjon Reed with Helmet Decal, Wore 'Stop Hate' Instead*, WTHR.com (ABC Dallas Channel 8) (Sep. 12, 2020 [Updated Dec. 17, 2020]), https://www.wfaa.com/article/sports/nfl/dreasjon-reeds-name-on-list-for-nfl-helmet-pad-display-of-police-shooting-victims/531-bfe7dac2-3522-4228-8d20-f9e9c3d8314e (last visited March 9, 2021).



70.     The Tweet was published approximately one month after the conclusions of the ISP's investigation into the May 6 Encounter were publicly released and a grand jury refused to indict Mercer.

71.     The Tweet incorporates a URL link ("bit.ly/2GYTB7H") that took viewers to the Website Publication, which, as previously alleged, stated that Reed was a "victim[] of systemic racism" and of "police misconduct."  This URL link was accessible to all viewers, regardless of whether the Tweet appeared on a desktop computer or a mobile device. The inclusion of the URL link constituted a republication of the false and defamatory statements conveyed in the Website Publication, and those same statements were incorporated into the Tweet.

72.     As a practical demonstration that the Tweet incorporated by reference the accusations from the Website Publication, at least one local news outlet reported, on the same day

the NFLE published its Tweet, that the accusations from the Website Publication were incorporated into the Tweet. The article's first paragraph reads:

> The NFL tweeted Wednesday that Dreasjon "Sean" Reed is one of 87 victims of systemic racism, victims of police misconduct, and social justice heroes who will be honored with helmet decals worn by players this season.

WishTV.com, *NFL Honors Dreasjon 'Sean' Reed, 21-year-old Fatally Shot by IMPD*, (Dec. 16, 2020),  https://www.wishtv.com/sports/indianapolis-colts/nfl-honors-dreasjon-sean-reed-21-year-old-fatally-shot-by-impd/.

73.     The Tweet is false because Mercer did not commit "police misconduct" or any action amounting to "police misconduct," as previously alleged.

**The Facebook Publication**

74.     On or about December 16, 2020, the NFLE published a post on its Facebook Page (the "Facebook Publication"). The Facebook Publication is still available online and can be accessed   at:   https://www.facebook.com/NFL/photos/a.131239636262/10159124435441263/ ?type=3 (last visited May 10, 2021). A true and correct copy of the Facebook Publication (with comments redacted) is attached hereto as ***Exhibit E***.  A screenshot of the Facebook Publication is reprinted below for convenience:



75.    The Facebook Publication, like the Tweet, was published approximately one month after the conclusions of ISP's investigation into the May 6 Encounter were publicly released and a grand jury refused to indict Mercer.

76.    The Facebook Publication contains the same text as the Tweet. The Facebook Publication, like the Tweet, incorporates by reference a URL link ("bit.ly/2GYTB7H") that took viewers to the Website Publication, which, as previously alleged, stated that Reed was a "victim[] of systemic racism" and of "police misconduct." This URL link was accessible to all viewers, regardless of whether the Facebook Publication appeared on a desktop computer or a mobile device. The inclusion of the URL link constituted a republication of the false and defamatory statements conveyed in the Website Publication, and those same statements were incorporated into the Facebook Publication and Tweet.

77.    The Facebook Publication is false because Mercer did not commit "police misconduct" or any action amounting to "police misconduct," as previously alleged.

## H.      THE NFLE'S PUBLICATIONS WERE OF AND CONCERNING MERCER

78.      The NFLE's Publications were about Mercer, who is an ascertainable, natural person.[18]

79.      Mercer's friends, family, and acquaintances, as well as the general community in Indianapolis, understood the NFLE's Publications to convey false accusations specifically about Mercer. In fact, several of Mercer's friends asked him about the accusations made in the NFLE's Publications.

80.      It was well-known in the Indianapolis community that Mercer was the Metro Police officer who used force against Reed after Reed fired gunshots at Mercer during the May 6 Encounter. It was well-known in the Indianapolis community that the interaction between Mercer and Reed was the central focus of the May 6 Encounter, and that the May 6 Encounter unfortunately resulted in Reed's death.

81.      As a practical demonstration that the Indianapolis community understood the NFLE's Publications to be about Mercer, WishTV.com (a.k.a. Channel 8), a prominent Indianapolis news station, published an article on December 16, 2020 that explicitly linked the NFLE's Publications with the Metro Police. The headline of the article reads, "NFL honors Dreasjon 'Sean' Reed, 21-year-old fatally shot by IMPD (the Metro Police)."[19]

82.      Additionally, the Indianapolis Star, a leading local newspaper, published an article explicitly linking Mercer with the May 6 Encounter. *See* Elizabeth DePompei, *Grand Jury: No*

---

[18] Pursuant to Ind. Code 34-15-1-1, "[i]n an action for libel and slander, it is sufficient to state generally that the defamatory matter published or spoken was about the plaintiff. If the defendant denies the allegation, the plaintiff must prove at trial the facts showing that the defamatory matter was published or spoken about the plaintiff."

[19] WishTV.com, *NFL Honors Dreasjon 'Sean' Reed, 21-year-old fatally shot by IMPD*, (Dec. 16, 2020), https://www.wishtv.com/sports/indianapolis-colts/nfl-honors-dreasjon-sean-reed-21-year-old-fatally-shot-by-impd/.

*Charges for IMPD Officer Who Fatally Shot Dreasjon Reed*, IndyStar.com (Nov. 10, 2020), https://www.indystar.com/story/news/crime/2020/11/10/indianapolis-police-shooting-dreasjon-reed-grand-jury-verdict/5885006002/.

83.     Furthermore, a side-by-side image of Reed (on left) and Mercer (on right), reprinted below for convenience, has circulated online and is accessible via a Google search of "Dreasjon Reed." Upon information and belief, was published by the international DailyMail UK in the following online article: Rachael Bunyan, *Grand Jury Declines to Charge Indianapolis Police Officer Who Shot Man Dead Following High Speed Chase Which Was Streamed Live on Facebook*, DailyMail.Co.UK (Nov. 11, 2020), https://www.dailymail.co.uk/news/article-8937855/Grand-Jury-declines-charge-Indianapolis-police-officer-shot-man-dead-high-speed-chase.html:



84.     Further illustrating the reality that the NFLE's Publications were understood by the Indianapolis community to be about Mercer, a simple Google search of Plaintiff's full name yields

numerous images and articles about Reed. Likewise, a simple Google search of Reed's full name

yields numerous articles about Mercer and the May 6 Encounter.

# I.     THE NFLE'S PUBLICATIONS CONVEYED STATEMENTS OF FACT, WERE CAPABLE OF A DEFAMATORY MEANING, AND ARE DEFAMATORY *PER SE*

85.     The NFLE's Publications convey actionable statements of fact that are not mere

opinion. The NFLE's Publications accuse Mercer of committing certain occupational **conduct**, and

conduct is, by its very nature, objectively verifiable and can be proven either true or false.  Indeed,

whether Mercer committed "police misconduct"—and whether he committed actions amounting

to "police misconduct"—are accusations that can be assessed by a jury: these statements are not

rhetorical hyperbole and can be proven either true or false.  In fact, those accusations *were* proven

to be categorically false by the ISP investigation. Special Prosecutor Khoury herself said the grand

jury did not find sufficient evidence to either "indict" or even "accuse" Mercer of misconduct.

86.     The IMPD maintains several policy and procedure manuals on the use of force and

other topics. The NFLE's accusation that Mercer committed "police misconduct" implied the

existence of undisclosed, defamatory facts which amount to a violation of those standards or other

established practices or procedures.

87.     As well, the NFLE's Publications about Mercer, having been placed among the

photos and stories of Emmett Till[20] and George Floyd, give rise to the inference and implication

that Mercer committed criminal acts during the May 6 Encounter.

---

[20] The story of Emmett Till is well-known. In the summer of 1955, Emmett Till, a 14-year-old Black teenager from Chicago, visited his family in Mississippi. Till was assailed by two men who alleged that Till was flirting with one of their wives. The two men forced Till to carry a 75-pound cotton gin fan to the bank of the Tallahatchie River and ordered him to strip naked. The two men then beat him nearly to death, gouged out one of his eyes, shot him in the head and threw his body, tied to the cotton gin fan with barbed wire, into the river. *See* History.com, *August 28, 1955: Emmett Till is Murdered*, https://www.history.com/this-day-in-history/the-death-of-emmett-till (last visited May 12, 2021).

88.     The NFLE's Publications convey a false and defamatory gist and sting about Mercer.

89.     The NFLE's Publications are defamatory *per se* because they convey a defamatory imputation—that Mercer committed occupational misconduct and criminal conduct—on their face, without resort to extrinsic evidence.  *See Dugan v. Mittal Steel USA Inc*., 929 N.E.2d 184, 187 (Ind. 2010) ("… statements imputing criminal conduct or occupational misconduct … clearly qualify for consideration as defamation *per se*."). Indeed, as previously alleged, the NFLE accused Mercer of committing "police misconduct."

90.     Furthermore, words falsely written that tend to prejudice or injure a person in his profession, trade, or business are actionable per se. *See Glasscock v. Corliss*, 823 N.E.2d 748, 754 (Ind. Ct. App. 2005) (holding communication accusing plaintiff of committing misconduct in his trade or business was defamatory *per se*); *Stanley v. Kelley*, 422 N.E.2d 663, 669 (Ind. Ct. App. 1981) (finding allegation that employee intended to leave employer and recruit other employees to join competitor could be defamatory *per se*); *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223 (Ind. Ct. App. 2005) (holding that email accusing girl scout leader of arriving drunk at a troop outing was defamatory *per se*).

## J.     MERCER SUFFERED DEMONSTRABLE PUBLIC HATRED AND SCORN

91.     As a practical demonstration that the accusations perpetuated by the NFLE subjected Mercer to public hatred and scorn, Mercer offers the following examples:

    a.  Within several days after the May 6 Encounter, Mercer received a death threat via a phone call from an anonymous Illinois phone number.

    b.  Within days after the May 6 Encounter, numerous threats were posted by various individuals on social media websites such as Facebook and Twitter.

c.  Subsequent to the NFLE's Publications, many similar threats were inspired by and referred specifically to the NFLE's Publications.

d.  Beginning in or around October of 2020, after the NFLE's Video and Website Publication, an image of a "Wanted" poster with Mercer's photograph began spreading on the internet. This image has been scattered across the internet and remains online to the date of filing this Complaint. A true and correct copy of this image is copied below:



e.  A week after the May 6 Encounter, Mercer was identified and filmed by a woman while Mercer was shopping at an Indianapolis Wal-Mart. While Mercer was minding his own business, the woman held her children away from Mercer as if Mercer were dangerous and as if Mercer would harm her children. This incident devastated Mercer and inflicted severe mental anguish.

f.   After months of social media threats, in fear of his own safety, Mercer moved out of his house where he lived alone. Mercer sold his house in or around December of 2020 and moved in with a friend. Mercer continues to live with that friend to the date of filing this Complaint.

92.   The NFLE's Publications were a substantial factor in causing public hatred and scorn to perpetuate against Mercer.

## K.   MERCER IS A PRIVATE FIGURE REQUIRED TO PROVE MERE NEGLIGENCE AGAINST THE NFL

93.   Mercer is a private figure, having lived his entire life outside the public eye and having no notoriety of any kind prior to the May 6 Encounter and the Publications identified herein.

94.   Despite the reality that Mercer is a police officer, he is not a "public official" required to prove actual malice against the NFLE, in part because:

a.   Mercer is a rank-and-file police officer;

b.   Mercer is merely an employee of the IMPD;

c.   Mercer was not elected by public vote;

d.   Mercer did not, and does not, carry a leadership role in the IMPD or any other public agency; and

e.   Mercer did not make any public statements about the May 6 Encounter on behalf of the IMPD or any other public agency.

95.   At no time during the relevant period did Mercer voluntarily inject himself into the controversy surrounding, or the public discussion about, the May 6 Encounter. At no time did Mercer involve himself publicly to the point that he either assumed a role of public prominence or was in a position to influence others or the outcome of the controversy surrounding, or the public discussion about, the May 6 Encounter.

96.     Mercer issued no public statements about the May 6 Encounter and made no media appearances. In fact, Mercer took proactive steps to avoid all interviews and other public speech about the May 6 Encounter. For example:

      a.   Mercer deleted and removed from the internet all of his personal social media accounts within days of the May 6 Encounter so that he could not be found by reporters and/or other individuals;

      b.   A Cable News Network ("CNN") reporter reached out to Mercer in June of 2020 for his comment on the May 6 Encounter and a related lawsuit. Mercer did not respond to the reporter, and Mercer gave no statement or interview; and

      c.   Local news stations, including the Indiana Star, contacted Mercer's attorney, John Kautzman, and Mercer's mother for a comment. Mercer instructed both his attorney and his mother not to make a public statement to any reporters or news stations about the May 6 Encounter.

97.     Mercer has never enjoyed regular or continuing access to the media.

98.     Mercer made no public appearances prior to or after the May 6 Encounter or the NFLE's Publications.

99.     As a private figure, Mercer is merely required to plead and prove that the NFLE published its Publications negligently.

100.    Even if Mercer is deemed a public figure, subject to establishing the "actual malice" standard of fault, the NFLE acted with actual malice: it either knew the statements it was publishing about Mercer were false, or acted with reckless disregard to the statements' truth or falsity.

**L.    THE NFLE PUBLISHED NEGLIGENTLY, WITH A RECKLESS DISREGARD OF THE TRUTH, AND WITH ACTUAL KNOWLEDGE OF FALSITY**

101.    The NFLE published its false and defamatory accusations about Mercer negligently, with a reckless disregard of the truth, and with actual knowledge of falsity. The NFLE failed to investigate the May 6 Encounter, entertained serious doubts about the truth of its Publications, and had actual information via the owner of the NFL's Indianapolis Colts, Jim Irsay, that the NFLE's Publications were "misinformation."

102.    The information exculpating Mercer, detailed above, was highly-publicized and readily available via a Google search or other search engine. The NFLE, however, ignored it.

103.    Despite quick and easy access to the truth, approximately one month after Mercer was publicly exculpated, the NFLE published its Tweet and Facebook Publication, doubling down on the false and defamatory "police misconduct" accusation from the Website Publication.

104.    The NFLE should have known that Mercer committed no "police misconduct" because the ISP's investigation, Ms. Khoury's public statement, and the grand jury's refusal to indict were publicly available for over one month prior to the Tweet and Facebook Publication.

105.    Various Twitter users commented on the NFLE's Tweet, highlighting the shocking failure of the NFLE—the digital media arm of one of the world's largest sports leagues with formidable resources—to investigate the May 6 Encounter and publish information exculpating Mercer. For example, one Twitter user asked:

> Isn't this the guy (Reed) that drove around shooting his Glock out the window?  And then Facebook lived (sic) him running from the cops and saying "I ain't getting caught" and then opened fire on police? @NFL you guys have how much money but you can't do a simple (sic) research on this guy?[21]

---

[21] This tweet was published by Twitter user "Ben Grey" (@BenGrey16661342) and can be accessed at: https://twitter.com/BenGrey16661342/status/1340104302078156807 (last visited March 10, 2021).

A deluge of other commentors posted on the Facebook Publication, highlighting the same sentiment and submitting the same query: how could the NFLE lack the resources to investigate its claim that Mercer committed police misconduct?

106.    The NFLE had ample resources to investigate the May 6 Encounter but failed to investigate it in any manner whatsoever.

107.    Not only did the NFLE manifestly fail to investigate its accusations, the NFLE possessed information, by and through Jim Irsay, the owner of the NFL's Indianapolis Colts, conceding that the NFLE's Tweet and Facebook Publication contained "misinformation" about Mercer that someone at the NFLE was purportedly "addressing," as alleged later in this Complaint.

108.    Irsay published several tweets on December 17, 2020, the day after the NFLE's Tweet and Facebook Publication were published. Both of Irsay's tweets are hereby incorporated by reference.

109.    Irsay's first tweet confirms, despite what is published by the NFLE on the Website, that Indianapolis Colts player Matthew Adams would not be wearing a helmet decal honoring Reed:



110.    At least one news station confirmed the gist of Irsay's statement on the same day. Although the NFLE said that Colts' linebacker Matthew Adams would be honoring Reed by wearing a helmet decal with his name, Adams (or someone at the NFL's Colts franchise) decided Adams would not honor Reed, and Adams simply wore a helmet decal that said "Stop Hate" instead. WTHR.com Staff, *Colts Player Will Not Honor Dreasjon Reed with Helmet Decal, Wore 'Stop Hate' Instead*, (Sep. 12, 2020; Updated Dec. 17, 2020), https://www.wthr.com/article/news/local/dreasjon-reeds-name-on-list-for-nfl-helmet-pad-display-of-police-shooting-victims/531-bfe7dac2-3522-4228-8d20-f9e9c3d8314e.[22]

111.    In another tweet published by Irsay in response to the WTHR article, cited above, Irsay wrote: "Misinformation which we are addressing; and the only person we are honoring on Sunday will be our long time Colts family member Greg Hylton, who passed away last week."



---

[22]    This article was republished by other news outlets. *See* https://www.wfaa.com/article/sports/nfl/dreasjon-reeds-name-on-list-for-nfl-helmet-pad-display-of-police-shooting-victims/531-bfe7dac2-3522-4228-8d20-f9e9c3d8314e (last visited March 9, 2021).

112.     Despite Irsay's labeling of the NFLE's Publications as "misinformation," the NFLE took no action to address or remediate its false accusations.

113.     In addition to the information possessed by Jim Irsay, the NFLE possessed information contradicting its false accusations through one of the NFL's head coaches, Frank Reich.  Mr. Reich is the head coach of the Indianapolis Colts, one of the NFL's member teams.

114.     Within days after the Say Their Stories Video was published, Chief Taylor contacted Indianapolis Coach Frank Reich and explained to him that Mercer committed no police misconduct in connection with the May 6 Encounter.

115.     Information known to Irsay and Reich—including that the NFLE's Publications were "misinformation"—was knowledge imputed to the NFLE through the National Football League.

116.     The National Football League exercises ultimate supervisory authority and control over Irsay, who is an individual holding a direct interest in the Indianapolis Colts.

117.     For example, pursuant to Section 3.2(B)(3) of the National Football League's Constitution and Bylaws, which are hereby incorporated by reference into this Complaint, "[t]he [member club] and all individuals or entities holding a direct or indirect interest in the [member club] shall be subject to all of the League policies and requirements on ownership that the members may from time to time adopt or apply…."[23]

118.     The National Football League exercises ultimate supervisory authority and control over Reich, who, as a head coach, is an agent and employee of one of the National Football

_____

[23] See also Section 4.3, providing that the NFL has exclusive control over football games by member clubs, and Section 4.4(E), league has exclusive control over the NFL's trademarks. A copy of the NFL's Constitution and Bylaws can be accessed at: https://www.onlabor.org/wp-content/uploads/2017/04/co_.pdf (last visited May 19, 2021).

League's member teams. Reich is an agent of the National Football League, and Reich is subject to rules established by the National Football League.

## CAUSES OF ACTION

### Count 1—Defamation

119.    The preceding paragraphs are hereby incorporated by reference as if fully realleged herein.

120.    Each of the NFLE's Publications are demonstrably false for the reasons previously alleged herein.

121.    Each of the NFLE's Publications is of and concerning Mercer for the reasons previously alleged herein.

122.    The NFLE's Publications impute specific charges of conduct to Mercer, including that Mercer committed actions amounting to "police misconduct" in connection with the May 6 Encounter.

123.    Each of the NFLE's Publications is capable of a defamatory meaning because, when read and viewed by a reasonable reader in context, the specific charges of conduct tend to, in no particular order:

        a.  subject Mercer to hatred, ridicule, and contempt;

        b.  diminish Mercer's standing in the community; and

        c.  denigrate Mercer's fitness for his occupation as a police officer.

124.    Each of the NFLE's Publications is defamatory *per se* because it is defamatory on its face without any reference to outside material; each Publication falsely denigrates and injures Mercer's reputation in his trade or profession.

125.    Each of the NFLE's Publications contained statements of fact that can be proven either true or false, and the NFLE intended to convey its accusations about Mercer as statements of fact. The NFLE did not publish its false statements as mere parody or opinion.

126.    The NFLE published its false accusations negligently and with actual malice, as previously alleged in this Complaint.

127.    The NFLE's Publications were unprivileged.

128.    Mercer has suffered significant reputational harm and other damages as a result of the NFLE's Publications, and Mercer will continue to suffer perpetual reputational harm.

129.    As a proximate result of the NFLE's Publications, Mercer suffered severe emotional distress and personal physical injury.

130.    Cumulatively, Mercer will suffer millions of dollars of damages and financial losses throughout the course of his life.

**WHEREFORE**, Mercer respectfully prays:

(a) That judgment be entered against the NFLE, jointly and severally, for substantial compensatory damages in an amount to be determined at trial;

(b) That the NFLE be held liable for the reputational harm it has caused Mercer;

(c) That judgment be entered against the NFLE for punitive damages in an amount to be determined at trial;

(d) That Mercer recover pre- and post-judgment interest;

(e) That Mercer recover his reasonable attorneys' fees and expenses from the NFLE;

(f) For trial by jury on all issues so triable;

(g) That all costs of this action be taxed to the NFLE; and

(h) That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

Respectfully submitted this 14th day of June, 2021:

**HEMMER DEFRANK WESSELS, PLLC**

**LAW OFFICES OF GUY A. RELFORD**

*/s/ Todd V. McMurtry*_____

*/s/ Guy A. Relford*_____

Todd V. McMurtry
(*pro hac vice motion forthcoming*)
Jeffrey A. Standen
(*pro hac vice motion forthcoming*)
J. Will Huber
(*pro hac vice motion forthcoming*)
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

Guy A. Relford
(Attorney No. 6450-49)
One South Rangeline Road, Suite 110
Carmel, Indiana 46032
Phone: (317) 844-4297
Fax: (317) 703-3457
guy@relfordlaw.com

*Trial Attorneys for Plaintiff,*
*De'Joure Mercer*